and your honors I would like to reserve a couple minutes my name is Mary Lou Wilson and I'm representing mr. Prentice this morning excuse me mrs. Wilson I wonder if we could close the day we're having some noise in the hallway and I want to make sure we hear everything you say there we go thank you it's an honor to be here thank you very much I would like to focus on mr. Prentice's first contact with the apartment mr. Miller's apartment and what does the the experienced detectives detective long and Ramos know when they get there they know that mr. Miller has been dead for a week seven to ten days because he's in early decomposition we have mr. Prentice's documents we know that mr. Prentice was on probation we know that mr. Prentice was a roommate because the photograph was there and these detectives these experienced detectives took that photograph and went to neighbors houses and they identified them we also know that there's a bloody boot print on a blanket and we know it's a boot we also know there's bloody fingerprints and we also know that there's a swastika most importantly we know there's a swastika carved on the deceased person's back these are very key and important things to know why because my suggestion to your honors is that mr. Prentice was a suspect right then what if he was I think you have a strong argument that he was but I have the same question judge Silverman has what if he was well what if he was that's important because the state is trying to show that he wasn't no I mean the question is not whether he's a suspect the question is whether he was in custody well but what if he was in I think he was in custody well you may think it but that's what evidence is he that he was in custody I'm so glad you asked he was in custody at the time they hooked him up at Diana Gamuccio's apartment and I'll tell you why because I preface what they knew before they got to Diana Gamuccio's apartment and I'll tell you the key thing that is a very tiny statement from detective long during his trial testimony he says well we went to a Las Vegas and North Las Vegas apartment and why is that important that's important because that's where mr. Prentice said he was living and when they got to that North Las Vegas apartment he wasn't there and he spoke to a gal and the gal said he was only here for two days so this is my suggestion to you they knew he was in violation of his probation right then and there because he was not there he that's where he told his PO he was they knew that then what how does that put him in custody well we're not we're not there yet but this is I'm not following your point you told me they know a lot of stuff the issue is was he arrested at the apartment I I believe I can prove to you that he was so with that background of what I told you what these experienced detectives know when they get to Dan Miller's apartment they have all this stuff then when they get to trying to locate him they find he's not there he's only been there for two days he's in violation right there so when he gets to the apartment now things are really clicking because we have all these witnesses that are in the apartment and we have Diana lying the first person that comes to the door is the mom of Ashley Jenkins she's a you know the owner and she says I don't know who Anthony Prentice is the second person who's Diana says I know who he is and he's not here so we know that's a lie because long says that amped it up your time is ticking can I get you to focus on another question certainly your honor what if there's a Miranda violation this is an IAC claim right a 2-2-5-4 claim so let's talk about pronged to if you could please I'm sorry wasn't there very compelling evidence on prejudice right and what about the other witness who was right there and testified about what she saw I think you're talking about Ashley well yeah and Ashley Rattel is a very strong witness against him huge right however I suggest to your honor that if we could eliminate you know we we do have her as a suspicious character as well he's only known her a couple of days she is a prostitute and she's a very young girl so there's two people on the video how do we know that mr. Prentice couldn't say well that's Ashley Rattel and evil if all of mr. Prentice's statements are suppressed and I would suggest to you even before he gets into the officer's car because mind you my argument is he was arrested he was hooked up he was separated at Diana Gamuccio's apartment and he was said you're in violation of probation again if there's a Miranda violation okay can you take your best shot at pronged to of strickland for me please tougher I'm I you know I'm gonna admit to you tougher but Gamuccio I'm sorry Rattel is is the toughest witness and I think she's impeachable I think you could if you had a strong sense of impeaching her and frankly I I think the Supreme Court got it wrong because they were suggesting that it was wrong to talk about her being a prostitute in the trial transcript it appears to me that she was lying about a prior sexual assault if you look at the trial transcript it's they wanted to show hey she's lied before and she's lied about a sexual assault and so they were trying to attack her credibility not as being a prostitute although that's that's some good stuff too what was the most before in the car you tell me what is the most damaging statement he's made that they used against him perhaps it's his knowledge of the swastika before they told him about the swastika I'm sorry but I didn't see where he what did you tell me what what do you think was the worst thing they introduced against him of what he said let me let me put it another way I didn't find that anything he said was terribly inconsistent with what his defense was at the trial can you point me to what you're saying I probably what bothered me the most what was offensive to me the most was I and it just irritated me because I felt like it was the Christian burial statement when he takes off his hat and says you know and and Prentiss says he was like my dad and long made out like I never talked about Dan Miller and and I would suggest to your honor that that was disingenuous to me but I you know we had have him two hours at the apartment separated and they're talking to all these witnesses and they're getting all this yeah but you're not really you haven't really pointed me to anything that he said that you say was inconsistent with what he was what his defense was you know that he he he was like my dad and long says I never even mentioned Dan Miller so how does he know that Dan Miller is dead okay you're down to about 40 seconds so why don't you reserve the rest for your I would thank you very much thank you very much you good morning good morning your honors Karen Whelan for the state of Nevada your honors today on this IAC claim is kind of quizzical because we we have to talk about whether or not we have some sort of violation of the Miranda which was never itself on its own a standalone direct appeal claim we're just the issue is did did his representation fall below the standard that it should be for not having moved to suppress these statements which weren't challenged on direct appeal as Miranda statements in the first place so it kind of makes me wonder which direction I really need to go here as most of the briefing that came in talks a lot about these probation issues and whether that made it an actual or that he has actually arrested not even the sort of the feeling of arrest or the fact that he thought he was under arrest but she sort of asserts that he was arrested which the record doesn't support so was he taken in handcuffs from his from the apartment to the police station in the back of a police car he was and isn't that some addition of custody the officer explained that for safety purposes why wasn't he let me rephrase why wasn't he for safety purposes in custody he was being detained I would I would go that far he's being detained first at the apartment sort of three phases here at the apartment they have a whole bunch of people they're brought out of the or he's brought out more specifically the others are brought out with other officers as as the testimony shows there were other officers not only Metro officers but Henderson officers and each person in there was being so they could talk to everybody about what they may or may not know about the incident did the police report say that he was arrested at the apartment no it doesn't say that what the police report talks about is that he there's a paragraph in the police report right near the beginning that does say he was arrested on a probation violation but I would submit to you if you read the entire context of the police report that's not a chronological occurrence of what happened it's hard to tell isn't it well it's there's an indication that could give you an idea that it isn't and that is at the end of the report where they talk about the arrest of Harrison they talk about the arrest of Harrison the co-conspirator in the I believe it's the last page of the okay of the police report they talk about he was arrested before they talk about Prentice being arrested and we know that Prentice was arrested before Harrison was arrested so that's more indication that this is a police report he's putting down facts but he's not giving you a chronological and a pure chronological view of what happened that night so when we when we look at that and then we look at what the the US District Court said it's reasonable that what they said was that the testimony of the officers the sworn testimony morning was more credible than a notation in his police report so help us with the chronology they take him in handcuffs in the back of a car to the police station yes they take him into an interrogation room yes that's like every other interrogation I've ever seen it I don't I don't know that fact your honor and it wasn't in the record where I could find it whether what the actual physical appearance of the room was but I think if you look at Dyer Hornbeck the RV Hornbeck we have a very similar situation with the detention of a person post-crime very near the crime and then all of the things that bothered the Ninth Circuit about that but that they in the end had to conclude based on those factors that because it wasn't beyond any reasonable possibility for a fair-minded person to disagree with whether or not he was in custody you couldn't get relief under EDPA so if you if you line out the facts for instance the length of the of the interview in the in the house was or in the police station was four hours under Dyer it was about three a little more than three hours for the instant case that the time of night it was I think seven or so at night until 11 I think his interview ended at 2105 and he wasn't arrested in 12 2254 which also during that gap of time they went looking for the the man evil and other people because he was he was assisting them as he had said from the beginning he wanted to help so I think if you look at these Dyer things and you know also the the presentation of what evidence they might have against her in Dyer they told her hey people have told us you did this like the instant case where they said look we've got a boot print we've got you know different things that you know you've told us your knife could have been involved because of course Prentice is the one who offered up the fact that his knife could have been used by his friend who he sold it to so I think that that if if we if we go to was he in custody we have to look at Hornbeck and we have to conclude with Hornbeck and the cases that Hornbeck uses to support its decision that he doesn't get relief today council I'm looking at er 1309 and one sentence says Prentice was on probation for an escape charge and he said he had not notified his probation officer the very next sentence says Prentice was arrested for violation of his probation yes and then then it's next sentence after that's all right if I could the next sentence is he agreed to talk it sure looks to me like like the rest of this page is in is in chronological order so I don't think you've convinced me that there isn't any evidence in the record that this man was under arrest at the time he was questioned but if there's a if there's a Miranda violation then of course there's still this question about whether there's a tactical decision and whatnot under under Strickland but but what about pronged to of Strickland you see the evidence against him to me is it seems very very strong including especially this one witness Ms. Rattel it's strong with Rattel but it's strong with physical evidence too I mean we know that the boot was eventually not associated with him I believe that the record indicates that right but we we also know that we have Rattel we have Harrison's own confession which was a Miranda his confession in his case in which he he gives facts that he would not have been able to give had he not been in the room with the things happening that were happening there were what was the physical evidence that links Prentice to the crime the physical evidence is the knife that he owned and then subsequently gave to gave or sold to Harrison is the knife I believe the knife is the biggest piece of physical evidence like that was standing before you drawing a blank right now it is presumed to be the crime weapon they the record didn't have the record doesn't say it was the crime weapon weapon though it was found at the foot of the bed in the hotel in the apartment where the murder occurred with blood on it and and also he had some blunt force trauma to as well presumably with a hammer there was always the discussion how does how is that linked to apprentice it's not it's linked to Prentice only in the sense that Prentice knew about the hammer says he touched the hammer says he never hit him of course he says he was never there that he was outside a follow-up on judge Kristen's question in a do in addition to Rattel's testimony you said there was physical evidence I'm trying to put my finger on what the physical evidence is that's the physical there's blood there's blood in the scene I is not Prentice's blood is not found so that how does that help link him it doesn't okay so what physical evidence links him to the crime besides you know the testimony of the Rattel I just said there wasn't a lot of physical evidence it was it was testimony of other people testimony of things he said later were not in custody where he told other people later he wanted to go back and shoot Dan and finish it off so at the end of the end of the day this goes down to Rattel basically is the is the key evidence well it may do but I think it's very important to note that the statements that he made in in even the statements that counsel brought up were not solicited by the officers they were blurted out in the car they're volunteered and they're not Miranda violation they're not but if there's a Miranda violation then we have to ask okay what other evidence was there well got Rattel and then you say there's physical evidence but on examination there's not that much physical but if you take out if you take out the Miranda statements and rely on the rest of the physical evidence you still have to come back with any reasonable jurist to come to the conclusion that they did and I don't think that the burden has been met to overcome that so I don't think we have shown there's been a showing here that prejudice would occur wasn't one of the blurted statements that he said if there's a swastika carved on this man's back then yes he knew details about the statements also weren't the product of questioning correct those none of none of the statements outside of the Miranda's right and I think I noted four or five statements that were blurted out by him never solicited by the authorities at various stages of those sort of three-stage nothing thank you thank you very much miss Wilson got about a minute left I would suggest that the swastika was a huge physical evidence and that Prentiss was in fact linked to that because in the apartment we have to presume that there was some material Nazi books papers they do say there were writings and papers I mean he had when when he went to jail and they were trying to show that he got in a fight in jail he had his little Nazi paperwork with him and in the and the fellow inmate was making fun of his paper that's why they got in the fight according to the record yeah yeah so I'm gonna suggest to you that these officers knew before they got to the apartment all of this stuff I think I'm done but thank you so much thank you as well as we learn thank you the case just argued is submitted good morning
judges: Duffy, Silverman, Christen